United States Bankruptcy Court
Southern District of Texas

**ENTERED**

July 19, 2024

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 20-33274** |
| **LILIS ENERGY, INC.,** *et al.*, | § | |
| | § | **CHAPTER 11** |
| Debtors. | § | |
| | § | |
| **JOHN D. BAUMGARTNER, SOLELY IN HIS CAPACITY AS THE UNSECURED CLAIM POOL SUB-TRUSTEE,** | § § § § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | **ADVERSARY NO. 22-3193** |
| | § | |
| **ICT ENERGY SOLUTIONS, LLC,** | § § | |
| | § | |
| Defendant. | § | |

## <u>MEMORANDUM OPINION</u>

This case involves a $165,622.63 payment made by Lilis Energy, LLC to ICT Energy Solutions, LLC during the 90-day preference period. John D. Baumgartner, in his capacity as the Unsecured Claim Pool Sub-Trustee of Debtor Lilis Energy, moves for summary judgment, arguing that there is no genuine issue of material fact that precludes a finding that the payment is an avoidable preference under 11 U.S.C. § 547. ICT also moves for summary judgment, arguing both that the payment is not a preference under § 547(b), and, in the alternative, if the payment is a preference, recovery is precluded by § 547(c) affirmative defenses.

Summary judgment is granted in favor of Baumgartner on all affirmative defenses. Summary judgment is denied on the issue of whether the transfer is a preference. Because of the inchoate lien

defense, there is a genuine issue of material fact as to whether the payment is an avoidable preference under § 547(b).

## BACKGROUND

Lilis Energy Solutions, LLC (Lilis) was an energy company engaged in oil and gas exploration, development, and production in the Permian Basin. ECF No. 18-1 at 3. Lilis and its affiliates filed Chapter 11 bankruptcy petitions on June 28, 2020. ECF No. 1. On June 29, 2020, the Court entered an order directing joint administration of the Chapter 11 cases. ECF No. 28. The Court confirmed Lilis's joint Chapter 11 plan of liquidation on November 17, 2020. ECF No. 673. The plan had an effective date of December 4, 2020. ECF No. 743 at 1.

ICT Energy Solutions, LLC (ICT) is a manufacturer of oil and gas production equipment. ECF No. 19-1 at 2. On November 18, 2019, ICT entered into a Master Services Agreement with Impetro Operating LLC (Impetro), a Debtor-affiliate, under which ICT agreed to manufacture and furnish equipment to Lilis for use in its oil and gas operations. ECF No. 18-3 at 2. ICT claims that the manufactured equipment procured under the MSA was delivered to Lilis "for use in the treating of crude oil." ECF No. 19 at 7. Baumgartner claims that "the Debtors rejected delivery of the vessels contracted-for under the MSA because they were not built to the specifications desired by the Debtors." ECF No. 18 at 5. The evidence shows the equipment was delivered, but it is unclear whether the equipment was defective when it was delivered. The invoices for the equipment total $165,622.63. ECF No. 19-3 at 2–4.

A dispute arose between ICT and Lilis regarding the manufactured equipment. Due to this dispute, Lilis did not pay for the equipment. The parties entered into an agreement to resolve the dispute on April 15, 2020. ECF 19-4 at 2. The agreement provides that ICT and Lilis disagreed "as to (i) the amount of vessels and equipment that Lilis ordered, (ii) the amount of vessels and equipment that ICT delivered to Lilis, and (iii) the amount owed by Lilis to ICT for the vessels and equipment." ECF No. 19-4 at 2. Under the agreement, the parties resolved the dispute with the following terms:

> (1) Within five business days after the full execution of this Letter Agreement by all Parties, Lilis shall pay $165,622.63 to ICT . . . ; and (2) The Parties hereby unconditionally acquit and forever discharge the other Party of and from any and all liabilities, actions, obligations, causes of action, claims, demands, damages, costs, expenses, and compensation whatsoever, whether known or unknown, arising on or before the date of this Letter Agreement, at law or in equity or otherwise, against the other Party and any of such Party's related or affiliated persons or entities, that arise out of or are related to any goods or services provided by ICT to Lilis.

ECF No. 19-4 at 3.

ICT received the $165,622.63 payment from Lilis on April 30, 2020. Avoidance of the payment is the sole subject of this adversary proceeding.

Baumgartner filed this adversary proceeding on June 27, 2022, asserting causes of action for avoidable preference under 11 U.S.C. § 547 and recovery of avoided transfers under 11 U.S.C. § 550. ECF No. 1 at 7–8. ICT filed its answer on August 31, 2022. ECF No. 8. ICT's answer asserts an implied vendor's lien defense, as well as contemporaneous exchange of new value and ordinary course of business defenses under § 547(c). ECF No. 8 at 6–7. The parties filed motions for summary judgment after the close of discovery. ECF Nos. 18, 19.

Notably, ICT's summary judgment motion asserts an inchoate statutory mineral lien defense, which it did not assert in its complaint. ECF No. 19 at 10. Baumgartner argued that it was entitled to relief under Fed. R. Civ. P. 56(d) on grounds that had not been able to conduct sufficient discovery with respect to the newly asserted defense. ECF No. 22 at 10. The Court entered an order granting relief on November 6, 2023. ECF 28. Under the order, the Court re-opened discovery, set a deadline for filing amended dispositive motions, and deferred ruling on the motions for summary judgment until expiration of the deadlines. ECF No. 28 at 2.

No amended objection to ICT's motion for summary judgment was filed in accordance with the order. The Court now rules on the original motions and objections filed by the parties.

## JURISDICTION

The District Court has jurisdiction over this proceeding under 28 U.S.C. § 1334(a). Venue is proper in this District pursuant to 28 U.S.C. § 1409. This is a core proceeding under 28 U.S.C. § 157(b)(2). The dispute has been referred to the Bankruptcy Court under General Order 2012-6.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact means that evidence is such that a reasonable fact finder "could return a verdict for the nonmoving party." *Gorman v. Verizon Wireless Tex., L.L.C.*, 753 F.3d 165, 170 (5th Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). It is the movant's burden to establish that no genuine issue of material fact exists. *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (citing *Condrey v. SunTrust Bank of Ga.,* 429 F.3d 556, 562 (5th Cir. 2005)). A party asserting that a fact cannot be or is not genuinely disputed must support that assertion by citing to particular parts of materials in the record, showing that the materials cited do not establish the absence or presence of a genuine dispute, or showing that an adverse party cannot produce admissible evidence to support that fact. Fed. R. Civ. P. 56(c)(1). If the movant establishes "the absence of evidence supporting an essential element of the non-movant's case," the burden shifts to the non-movant to establish a genuine dispute of material fact. *Sossamon*, 560 F.3d at 326 (citing *Condrey*, 429 F.3d at 562).

In ruling on a motion for summary judgment, a court should view the facts and evidence in light most favorable to the non-moving party.

*Plumhoff v. Rickard*, 572 U.S. 765, 768 (2014). Nevertheless, the court is not obligated to search the record for the non-moving party's evidence. *Keen v. Miller Env't. Grp., Inc.*, 702 F.3d 239, 249 (5th Cir. 2012). "Summary judgment may not be thwarted by conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence." *Hemphill v. State Farm Mut. Auto. Ins. Co.*, 805 F.3d 535, 538 (5th Cir. 2015). The Court need only consider the cited materials, but it may consider other materials in the record. Fed. R. Civ. P. 56(c)(3). The Court should not weigh the evidence. *Aubrey v. Sch. Bd. Of Lafayette Par.*, 92 F.3d 316, 318 (5th Cir. 1996). A credibility determination may not be part of the summary judgment analysis. *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014).

## DISCUSSION

Baumgartner argues that a $165,622.63 transfer made by Lilis to ICT is an avoidable preference under § 547(b) of the Bankruptcy Code. ICT does not contest the satisfaction of elements (1) through (4) of § 547(b). However, it argues that its entitlement to an inchoate lien defense precludes a finding that § 547(b)(5) is met. ICT also argues entitlement to the contemporaneous exchange of new value and ordinary course of business defenses under § 547(c). There is a genuine issue of material fact as to whether the inchoate lien defense applies.

## I.    ICT's Inchoate Lien Defense Is Not Waived

Baumgartner argues that ICT's failure to assert its inchoate lien defense in its answer to Baumgartner's complaint has caused prejudice to ICT sufficient to waive the defense because Baumgartner has been unable to conduct sufficient discovery to properly respond to the defense. ECF No. 22 at 6–10. ICT argues that, first, the defense is not an affirmative defense subject to waiver, and second, that there has been no prejudice to ICT. ECF No. 23 at 7–12.

Fed. R. Civ. P. 8(c) requires a party to "affirmatively state any . . . affirmative defense" in a responsive pleading. "But if 'the [affirmative defense] is raised in the trial court in a manner that does not result in unfair surprise,' then a 'technical failure to comply precisely with Rule

8(c) is not fatal.'" *Motion Med. Techs., L.L.C. v. Thermotek, Inc.*, 875 F.3d 765, 771 (5th Cir. 2017) (quoting *Lucas v. United States*, 807 F.2d 414, 417 (5th Cir. 1986)). "A defendant thus avoids waiver if (1) the defendant raised the affirmative defense 'at a pragmatically sufficient time,' and (2) the plaintiff 'was not prejudiced in its ability to respond.'" *Id.* (quoting *Lucas*, 807 F.2d at 418).

On November 6, 2023, the Court granted Baumgartner relief under Fed. R. Civ. P. 56(d) to conduct additional discovery on ICT's inchoate lien defense and submit an amended objection to ICT's motion for summary judgment. ECF No. 28 at 2. This relief was granted because the Court found Baumgartner had made a sufficient showing that it had not been able to conduct reasonable discovery with respect to the defense. ECF No. 28 at 1. Baumgartner failed to submit an amended objection. Baumgartner had a sufficient opportunity to respond to ICT's affirmative defense and did not utilize that opportunity.

ICT's inchoate lien defense is not waived.

## II.   THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER THE TRANSFER IS AN AVOIDABLE PREFERENCE UNDER § 547(B)

Although elements (1) through (4) of § 547(b) are met, the Court is unable to determine at this stage of the proceeding whether ICT had the right to perfect a statutory lien sufficient to warrant the inchoate lien defense to § 547(b)(5). There is a genuine issue of material fact as to the applicability of the defense.

### A.    Elements (1) Through (4) of § 547(b) Are Met

Under 11 U.S.C. § 547(b), to avoid the $165,622.63 transfer as a preference, Baumgartner must demonstrate that the transfer was

(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of the transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

The trustee bears the burden of proving the elements of a preference under subsection (b).  *Id.* § 547(g).

To avoid a transfer in property, "it is essential that the debtor have an interest in the property transferred so that the estate is thereby diminished.*" Coral Petroleum, Inc. v. Banque Paribas-London*, 797 F.2d 1351, 1355–56 (5th Cir. 1986) (quoting *Genova v. Rivera Funeral Home (In re Castillo)*, 39 B.R. 45, 46 (Bankr. D. Colo. 1984)).  The parties do not dispute that the $165,622.63 transfer made by Lilis to ICT was of Lilis's property.

With respect to the first element, the parties do not dispute that Lilis was obligated to pay the transfer as a result of the indebtedness owed to ICT resulting from the parties' settlement agreement.  That settlement agreement obligated Lilis to pay to ICT the exact amount of the transfer.  ECF No. 19-4 at 3.  The debt owed to ICT is sufficient to establish ICT as a creditor under 11 U.S.C. § 101(10).  This element is satisfied.

With respect to the second element, [a] debt is 'antecedent' for purposes of § 547(b) if it was incurred before the alleged preferential transfer."  *Baker Hughes Oilfield Operations, Inc. v. Cage (In re Ramba, Inc.)*, 416 F.3d 394, 399 (5th Cir. 2005).  ICT admits that the transfer "satisfied the indebtedness agreed to within the settlement agreement between the parties."  ECF No. 8 at 4.  The indebtedness arose prior to the transfer.  This element is satisfied.

With respect to the third element, "the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition." § 547(f). "The party seeking to rebut the presumption must introduce some evidence to show that the debtor was solvent *at the time of the transfer*; mere speculative evidence of insolvency is not enough." *Gasmark Ltd. Liquidating Tr. v. Louis Dreyfus Nat. Gas Corp.*, 158 F.3d 312, 315 (5th Cir. 1998). ICT offers no evidence to rebut the presumption of insolvency. This element is satisfied.

With respect to the fourth element, ICT is not an insider of Lilis. The ninety-day timeframe applies under § 547(f). Lilis filed its bankruptcy June 28, 2020. The preferential period is March 30, 2020, through June 28, 2020. The parties do not dispute that the transfer was made on April 30, 2020. April 30, 2020, is well within the preference period. This element is satisfied.

Elements (1) through (4) of § 547(b) are satisfied.

## B.     There Is a Genuine Issue of Material Fact as to Whether § 547(b)(5) Is Met

"The final element requires the Plan Administrator 'to present a hypothetical Chapter 7 distribution analysis as of the date the bankruptcy petition was filed.'" *In re Emas Chiyoda Subsea Ltd.*, No. 17-31146, 2020 WL 1696105, at *6 (Bankr. S.D. Tex. Apr. 6, 2020) (quoting *Moser v. Bank of Tyler (In re Loggins)*, 513 B.R. 682, 707 (Bankr. E.D. Tex. 2014)). The Court must determine whether the creditor obtained more pursuant to the transfer than the creditor would have received in a hypothetical Chapter 7 distribution, had the transfer not been made. § 547(b)(5). "The net result is that, as long as the distribution in bankruptcy is less than one hundred percent, any payment on account to an unsecured creditor during the preference period will enable that creditor to receive more than he would have received in liquidation had the payment not been made." *In re Emas Chiyoda Subsea Ltd.*, 2020 WL 1696105, at *6 (quoting *Moses*, 513 B.R. at 707).

"Generally, under § 547(b)(5), a trustee cannot avoid most statutory liens created under state law because such creditors are secured and so would be compensated to the extent of their secured interest." *In re Electron Corp.*, 336 B.R. 809, 811 (B.A.P. 10th Cir. 2006) (citing 11 U.S.C. §§ 506(a), 547(c)(6), 545). "[A] transfer to a fully secured creditor is immunized from preference attack because the creditor would have been paid in full in a hypothetical Chapter 7 liquidation by virtue of its realization on its collateral." *Official Committee of Unsecured Creditors of 360Networks (USA) Inc. v. AAF-McQuay, Inc. (In re 360Networks (USA) Inc.)*, 327 B.R. 187, 190 (Bankr. S.D.N.Y. 2005). However, "[w]here a partially secured creditor is paid from property not covered by its lien or privilege, there is a preferential effect because in a Chapter 7 liquidation, that creditor would receive a distribution for the full value of its secured claim, in addition to the payments already received." *In re Whistler Energy II, LLC*, 607 B.R. 253, 263 (Bankr. E.D. La. 2019).

"There is a division among courts as to whether an unperfected inchoate lien right is sufficient to defeat a preference claim." *In re BFN Operations LLC*, 604 B.R. 268 (Bankr. N.D. Tex. 2019), *aff'd sub nom. BFN Operations, LLC v. PLT Constr. Co., Inc.*, 616 B.R. 683 (N.D. Tex. 2020). The Northern District of Texas has agreed with the majority of courts in holding that "[i]f the creditor could perfect the lien under state law at the time payment is made, and the perfection of the lien is not avoidable under the Bankruptcy Code, then the payments are not recoverable." *Id.*

> The inchoate lien defense to § 547(b)(5) recognizes that, since the holder of inchoate lien cannot perfect its lien after being paid in full, a court's refusal to protect such transfers from avoidance exposes the holder to "an unreasonable Hobson's choice between accepting payment (with the attendant risk that it could be avoided if the payor enters bankruptcy) or taking the commercially unreasonable step of declining payment in order to perfect an inchoate statutory lien."

*Id.* (quoting *360Networks (USA) Inc.*, 327 B.R. at 195).  The Court finds persuasive the position taken by the Northern District of Texas and the majority of courts.

### (1)  ICT Is Not Entitled to an Implied Vendor's Lien Under Texas Law

ICT's answer seeks to apply the inchoate lien defense as of an implied vendor's lien.  ECF No. 8 at 7.  It argues that it "had a valid, enforceable implied vendor's lien because (1) ICT was entitled to perfect its vendor's lien under Texas law at the time it received the Transfer, and (2) its perfection of the lien would not be avoidable under the Bankruptcy Code."  ECF No. 8 at 7.  However, ICT no longer asserts an implied vendor's lien, instead relying on a statutory mineral lien as the basis for its inchoate lien defense.  ECF No. 21 at 14–15.

"An implied vendor's lien exits to secure the payment of purchase money when no express lien is reserved in a contract or deed and the purchase money is not paid."  *Trison Inv. Co. v. Woodard*, 838 S.W.2d 790, 792 (Tex. App. 1992), *writ denied* (Mar. 24, 1993).  "A lien arises by implication as 'a natural equity' that creates a constructive trust so that a vendee cannot keep the estate of another without paying for it."  *Id.*

As Baumgartner identifies, an implied vendor's lien applies only to the context of real property transfers.  *See id.*  ICT has not cited, and the Court has not been able to identify, any authority applying an implied vendor's lien to a conveyance of personal property.  Because the manufactured equipment delivered to Lilis is not real property, and ICT provides no explanation as to how an implied vendor's lien would apply to the transaction, ICT has failed to demonstrate a genuine issue of material fact as to its entitlement to an implied vendor's lien to satisfy the inchoate lien defense.[1]

ICT may not assert an implied vendor's lien as the basis of its inchoate lien defense.

---

[1] ICT no longer asserts an implied vendor's lien but claims that it nevertheless "reserves all rights related to an equitable implied vendor's lien."  ECF No. 21 at 15.  ICT may no longer assert the lien given the Court's dismissal of the issue.

> **(2)    There Is a Genuine Issue of Material Fact as to the Existence of a Perfectable Statutory Mineral Lien at the Time of the Transfer**

The inchoate statutory lien defense requires the existence of a perfectable statutory lien at the time of the transfer that is unavoidable under the Bankruptcy Code. *BFN Operations LLC*, 604 B.R. at 275. Because the analysis is performed in the context of the § 547(b)(5) hypothetical Chapter 7 test, the Court also considers "whether the value of the collateral securing the inchoate liens was less than the amount paid (with the result that some portion of the pre-petition transfers should be treated as unsecured and perhaps avoidable)." *360Networks (USA) Inc.*, 327 B.R. at 193.

ICT claims that it had the right to perfect a statutory mineral lien under Texas law at the time of the transfer. It further claims that it waived perfection of its lien in exchange for the transfer, that the lien would have been unavoidable under the Bankruptcy Code, and that there is sufficient equity in the manufactured equipment to support the lien. ECF No. 19 at 12–17.

Tex. Prop. Code § 56.002 provides that "[a] mineral contractor or subcontractor has a lien to secure payment for labor or services related to mineral activities." The statute subjects to a lien "the material, machinery, and supplies furnished or hauled by the lien claimant." Tex. Prop. Code § 56.003(a)(1). The statute defines "mineral activities" as "digging, drilling, torpedoing, operating, completing, maintaining, or repairing an oil, gas, or water well, an oil or gas pipeline, or a mine or quarry." Tex. Prop. Code § 56.001(1). It defines a "mineral contractor" as "a person who performs labor or furnishes or hauls material, machinery, or supplies used in mineral activities under an express or implied contract with a mineral property owner or with a trustee, agent, or receiver of a mineral property owner." *Id.* § 56.001(2). It defines a "mineral property owner" as "an owner of land, an oil, gas, or other mineral leasehold, an oil or gas pipeline, or an oil or gas pipeline right-of-way." *Id.* § 56.001(3).

The first step is to determine whether ICT, Lilis, and the equipment provided under the MSA fit within the statute's definitions. ICT falls within the statute's definition of a mineral contractor. The declaration of Drew Bridges, the president of operations for ICT, describes ICT as "a manufacturer of a wide range of oil and gas production equipment, including steel tanks, pressure vessels, pipeline skids, flares and combustion equipment." ECF No. 19-1 at 2. The MSA further describes ICT as "in the business of providing services, goods, equipment, materials, personnel and/or facilities related to or in support of oil and gas exploration, development or production activities . . . ." ECF No. 19-2 at 2. Lilis falls within the statute's definition of a mineral property owner. Baumgartner's declaration describes Lilis as "a publicly-traded, independent energy company engaged in oil and natural gas production, specifically focused on the exploration, development, production, and acquisition of crude oil, natural gas, and natural gas liquids from properties in the Permian Basin . . . ." ECF No. 18-1 at 3. Similarly, the MSA describes Lilis as "engaged in oil and gas exploration, development and production activities." ECF No. 19-2 at 2. The manufactured equipment contracted for under the MSA included horizontal separators, scrubbers, and drip pots. ECF No. 19-1 at 2. This equipment was procured through the parties MSA, which is an express contract between ICT and Lilis, for use in the treating of crude oil. ECF 19-1 at 2. The contracted equipment is used in mineral activities as defined under the statute.

The parties dispute whether the equipment was furnished by ICT as required by the lien statute. *See* Tex. Prop. Code § 56.003(a)(1). Under a similar statute, the court in *Addison Urb. Dev. Partners, LLC v. Alan Ritchey Materials Co., LC*, 437 S.W.3d 597, 606 (Tex. App. 2014) defined furnish as "supplying the materials and nothing more." Under this definition, if ICT merely supplied the equipment to Lilis, it would be entitled to a lien on that equipment to secure payment for its services. Baumgartner claims the equipment was rejected, while ICT claims that "[t]here was another set of vessels that ICT manufactured for the Debtors which the Debtors rejected delivery of." ECF Nos. 22 at 15, 23 at 14. As evidence that the equipment was delivered, ICT points to the fact that the amount of the transfer paid pursuant to the parties'

settlement agreement is the exact same as the invoices for the manufactured equipment.  ECF Nos. 19-3 at 2–4, 19-4 at 2, 23 at 14.  It is fundamental that the amount paid in settlement of a claim cannot be used as adverse evidence substantiating the validity of the claim.  Fed. R. Evid. 408(a).  The existence of invoices does not provide any evidence of delivery.

Nevertheless, ICT has established that the equipment was delivered.  Bridges' declaration states that the equipment contracted for under the MSA was actually furnished to Lilis.  ECF No. 19-1 at 2.  The only contradictory evidence is Baumgartner's declaration, which states that, upon information and belief, the equipment was rejected upon delivery.  ECF No. 18-2 at 4.  The Fifth Circuit has instructed courts to strike statements in summary judgment affidavits when the statement is based on information and belief rather than personal knowledge.  *Bolen v. Dengel*, 340 F.3d 300, 313 (5th Cir. 2003), *as amended* (Oct. 1, 2003).  Fed. R. Civ. P. 56(c)(4) similarly provides that an "affidavit or declaration used to support or oppose a motion must be made on personal knowledge . . . ."  Baumgartner offers no evidence to dispute the fact that the equipment was delivered.

The evidence demonstrates that the equipment was furnished by ICT to Lilis.

The Court must next determine whether the mineral lien was subject to perfection at the time of the transfer.  The statute provides that "[n]ot later than six months after the day the indebtedness accrues, a person claiming the lien must file an affidavit with the county clerk in the county in which the property is located."  Tex. Prop. Code § 56.021(a).  The statute also provides:

> The indebtedness for material or services accrues on the date the material or services were last furnished.  All material or services that a person furnishes for the same land, leasehold interest, oil or gas pipeline, or oil or gas pipeline right-of-way are considered to be furnished under a single contract unless more than six months elapse between the dates the material or services are furnished.

Tex. Prop. Code § 56.005(b); *see also Shell W. E & P, Inc. v. Pel-State Bulk Plant, LLC*, 509 S.W.3d 581, 589 (Tex. App. 2016) ("[U]nder the guidance provided by section 56.005(b), it is presumed that materials or services furnished within a six-month period are furnished under a single contract.").

The manufactured equipment was all invoiced within an approximately three-month timeframe and is considered furnished under a single contract. Accordingly, the indebtedness accrues as of the latest date the equipment was delivered. The first invoice is dated September 30, 2019, while the last invoice is dated November 15, 2019. ICT argues that, because of the last invoice's date, "the *absolute earliest*, the last material furnished by ICT to the Debtors was furnished on November 15, 2019." ECF No. 19 at 15. If this is the case, then ICT would have until May 15, 2020, to perfect its lien. Since the parties agree the transfer was made on April 30, 2020, the transfer would be made at a time where ICT had a right to perfect its lien. The Court would agree with ICT if the last equipment delivery actually occurred on November 15, 2019 (or a later time). Although this is likely to be the case since the invoice dates suggest the equipment would be delivered on November 15 at the earliest, there remains an absence of evidence in the record as to when the equipment was actually delivered. Although Bridges' declaration states that the equipment was delivered, it does not provide a date of delivery. ICT has also not submitted any documents evidencing proof of delivery date. Nevertheless, the evidence is sufficient to create a genuine issue of material fact as to whether ICT's mineral lien, if it existed, was perfectable at the time of the transfer.

The Court next considers whether ICT's mineral lien would be avoidable under the Bankruptcy Code. The parties dispute whether ICT's potential lien would be avoided under Lilis's Chapter 11 plan. Their arguments miss the mark. Whether ICT's statutory lien is avoidable under the Bankruptcy Code for purposes of the inchoate lien defense is independent of how it may have been treated under Lilis's Chapter 11 plan. The facts of this case are highly comparable to *BFN Operations*. There, BFN "contracted with Defendant for Defendant to construct a nursery pad storage addition and loading dock on property BFN leased in North Carolina . . . ." *BFN Operations*, 604 B.R. at 271.

BFN agreed to pay a lump sum of $476,569 for the project and $5,000 for optional testing. *Id.* During construction, the defendant submitted seven invoices to BFN totaling $478,760.05. *Id.* Later, while Defendant was still owed $290,532.21, it executed a document titled "Final Payment Lien Waiver." *Id.* at 271–72. BFN later filed for bankruptcy under Chapter 11 of the Bankruptcy Code. *Id.* After filing, the trustee filed a complaint against the defendant for, among other claims, avoidable preference under § 547 "to avoid $290,523.21 in payments from BFN to Defendant, comprised of payments on Invoices 3, 6, and 7." *Id.* The defendant asserted the inchoate lien defense to § 547(b)(5), arguing that it had a right to a statutory lien under North Carolina law on the real property to secure payment of its labor. *Id.* at 273. It argued, as does ICT, that "had it not been paid in full prepetition, it would have acted in a commercially reasonable manner by perfecting its inchoate lien right, making it a secured creditor entitled to payment in full in a hypothetical liquidation." *Id.* The trustee did not dispute that the defendant had a valid inchoate lien right. *Id.* at 274. Rather, the trustee argued that the defendant released that right when it executed the Final Payment Lien Waiver. *Id.* It further argued, "since the payments at issue were received by Defendant on and after that date, Defendant held only a general unsecured claim and would not be entitled to payment in full in a hypothetical liquidation." *Id.*

The court first dismissed the trustee's lien waiver argument. It found that, based on the language of the waiver, waiver of lien rights was only to be effective after final payment of the amounts due. *Id.* Accordingly, the court held that "(1) Defendant held an inchoate lien right in the Debtor's leasehold interest, and (2) Defendant did not waive that inchoate lien right until after it was paid in full." *Id.* at 275.

The court then extended the inchoate lien defense to the facts of the case, finding that that the defendant was entitled to perfect its inchoate lien at the time it received the payments, and that perfection would not be avoidable under the Bankruptcy Code. *Id.* The court held that "the existence of Defendant's inchoate lien rights prevents the Trustee from establishing the elements of § 547(b)(5), assuming the value of the Debtor's leasehold interest was equal to or greater than the alleged preference payments." *Id.*

The facts of this case are substantially similar to those in *BFN Operations*. ICT argues that it had the right to perfect a statutory mineral lien at the time the alleged preferential transfer was made, which it released in exchange for the transfer. Accordingly, it argues, had the transfer not been made, it would have been paid in full as a secured creditor, negating the application of § 547(b)(5). As described above, there is a genuine issue of material fact as to whether ICT had a right to perfect a statutory mineral lien at the time of the transfer. However, if it did have that right, it released that right in exchange for the transfer. Prior to the transfer, the parties executed a settlement agreement that required Lilis to pay $165,622.63 to ICT in exchange for each party acquitting and discharging the other party of all potential claims. ECF No. 19-2 at 4. The language of that settlement agreement is broad enough to include a release of any potential liens. *See* ECF No. 19-4 at 2. The release of lien rights was expressly conditioned upon the payment of the alleged preferential transfer. Had the transfer not been made, no lien release would have occurred, and ICT would have had the right to perfect its statutory lien.

The Texas mineral lien statute provides a statutory lien to ICT to secure payment of the manufactured equipment that arises automatically out of operation of law. Per the statute, the lien on the material "takes priority over an earlier encumbrance on the land or leasehold on which the material, machinery, supplies, or improvement is placed or located." Tex. Prop. Code § 56.004(b). The statute essentially provides a right to a first lien, and there is no basis to find that the lien is avoidable under the Bankruptcy Code.

The parties also contest whether, if the mineral lien existed, there would be sufficient equity for the lien to attach such that ICT would be a fully secured creditor under a hypothetical Chapter 7. It is true that the trustee has the burden of proving § 547(b), which would include the hypothetical Chapter 7 liquidation test under § 547(b)(5). *See BFN Operations*, 604 B.R. at 276. But the inchoate lien defense is an affirmative defense asserted to preclude a finding that ICT should be treated as an unsecured creditor for purposes of the liquidation test. The defense asserts that, even if ICT is an unsecured creditor who would receive more in a hypothetical Chapter 7 distribution, it should instead

be treated as a secured creditor who would have been fully paid out of its collateral. *See Salinas v. State Farm Fire & Cas. Co.*, No. CV B-10-194, 2011 WL 13254062, at *3 (S.D. Tex. Dec. 27, 2011) ("An affirmative defense is a defendant's assertion of facts and argument that, if true, will defeat the plaintiff's claim, even if all the allegations in the plaintiff's complaint are true."). ICT bears the burden of proving its affirmative defenses, and thereby carries the burden of proving that it would be fully secured. *Id.*

Baumgartner argues that the manufactured equipment was "never valued and were so defective they were rejected upon delivery by Debtors, there is a possibility the Delivered Vessels have no or little equity." ECF No. 24 at 11. Baumgartner's declaration provides that "[u]pon information and belief, the Debtors rejected delivery of vessels contracted for under the MSA because they were not built to the specifications desired by the Debtors." ECF No. 18-2 at 4. Under *Bolen*, the Court must strike any statement in a summary judgment affidavit that is based only on information and belief. 340 F.3d at 313. Baumgartner offers no evidence to demonstrate that the equipment was defective.

ICT argues that "[a]t the time of the Transfer, the Delivered Vessels were valued by both parties at the exact amount that ICT invoiced the Debtors for," and the settlement agreement and invoices "establish that there is no genuine issue of material fact that ICT's inchoate Statutory Mineral Lien would have been fully secured by the Delivered Vessels as of the date of the Transfer." ECF No. 19 at 17. Fed. R. Evid. 408(a) prohibits the use of settlement negotiations to prove the validity of a claim. ICT would not be able to use the terms of the parties' settlement agreement at trial to prove that the manufactured equipment had sufficient equity to secure its inchoate lien. *See* Fed. R. Civ. P. 56(c)(2). ICT also offers no evidence that the equipment was not defective. The only evidence offered by ICT to prove the value of the equipment are the invoices.

It is unclear based on the record whether the manufactured equipment was defective. If the equipment was defective, then ICT would not be a fully secured creditor, since its $165,622.63 claim against

Lilis would be secured by defective collateral likely worth less than its claim. If the equipment was not defective, the invoices do provide minimal evidence as to their value. But the invoices are unlikely in themselves to establish value since the equipment was supposed to have been specially manufactured in accordance with Lilis's specifications and may not have any value on the open market. ECF No. 19-1 at 2. Until more evidence is presented to create certainty as to their value, the Court is unable to determine whether there would be sufficient equity in the equipment to fully secure ICT's claim against Lilis. If the claim would not be fully secured, then the $165,622.63 transfer may be preferential as payment on the unsecured portion of ICT's claim. The value of the equipment will be determined at trial.

There is a genuine issue of material fact as to whether § 547(b)(5) is met.

## III.   AFFIRMATIVE DEFENSES UNDER § 547(C)

ICT asserts the contemporaneous exchange of new value and ordinary course of business defenses under § 547(c). Baumgartner moves for summary judgment, seeking a finding that the defenses are inapplicable. None of ICT's § 547(c) affirmative defenses shield the transfer. The defenses are dismissed.

### A.    The Transfer Was Not a Contemporaneous Exchange of New Value

Under § 547(c)(1), the trustee may not avoid a preferential transfer "to the extent that such transfer was—(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and (B) in fact a substantially contemporaneous exchange." "The purpose of the contemporaneous exchange exception is to protect transactions that do not result in a diminution of the bankruptcy estate." *In re Bison Bldg. Holdings, Inc.*, 473 B.R. 168, 175 (Bankr. S.D. Tex. 2012) (citing *Velde v. Kirsche*, 543 F.3d 469, 472 (8th Cir. 2008)). "If new value is given, a contemporaneous exchange does not diminish the estate." *Id.* (citing *Velde*, 543 F.3d at 472). "To defend itself under § 547(c)(1), a creditor must demonstrate 'intent, contemporaneousness

and new value.'" *Id.* (quoting *Southmark Corp. v. Schulte Roth & Zabel (In re Southmark Corp.)*, 239 F.3d 365, 2000 WL 1741550, at *3 (5th Cir.2000)).  Intent, contemporaneousness, and new value are a question of fact.  *Id.*  The Bankruptcy Code defines new value as

> money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation . . . .

11 U.S.C. § 547(a)(2).

ICT argues that its agreement with Lilis to release its inchoate lien in exchange for the transfer constitutes a contemporaneous exchange of new value.  ECF No. 21 at 21–24.

There appears to be a split in authority on the question of whether the release of an inchoate lien for a transfer can constitute new value within the meaning of § 547.  The court in *360Networks (USA) Inc.* answered the question in the negative, finding that "the release of a right to perfect a lien is not included in the Bankruptcy Code's definition of 'new value.'"  327 B.R. at 192.  The court reasoned that the majority of courts addressing the question have found that a lien release is not new value, relying "on the principle that the definition of new value in § 547(a)(2) is not merely illustrative but that it is exhaustive, that forbearance is not listed, and therefore that release of the right to perfect a statutory lien is not new value."  *Id.*  Courts in this circuit have applied this same reasoning, holding that "the right to perfect a lien is not the exchanging of 'new value' with the debtor because it is not money's worth in goods, services, or new credit, nor is it a release of property by the lienor that has previously been transferred to the lienor."  *Cimmaron Oil Co. v. Cameron Consultants, Inc.*, 71 B.R. 1005, 1009 (N.D. Tex. 1987); *see also In re Gulf Fleet Holdings, Inc.*, 485 B.R. 329, 338–39 (Bankr. W.D. La. 2013).

The Court agrees with the approach taken by the majority of courts and the courts in this circuit. Congress codified in the preference statute a specific definition of new value. The definition includes "release by a transferee of property previously transferred to such transferee." 11 U.S.C. § 547(a)(2). This language is broad enough to include the release of a lien, since liens are a property right. *See Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 798 (1983); *Armstrong v. United States*, 364 U.S. 40, 46 (1960). But the language would apply only to liens previously transferred to the transferee. ICT did not release a lien previously transferred from Lilis to ICT in exchange for the transfer. ICT's release of its right to perfect a potential statutory mineral lien did not provide any new value to Lilis. ICT has not identified any other basis for providing new value to Lilis.

ICT's contemporaneous exchange of new value defense is dismissed.

### B. The Ordinary Course of Business Defense Is Inapplicable

Section 547(c)(2) provides that the trustee may not avoid a preferential transfer

> (2) to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was—
>> (A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or
>> (B) made according to ordinary business terms . . . .

As amended by BAPCPA, the section provides for separate defenses, the ordinary course of business defense and the ordinary business terms defense. *See Hutson v. Branch Banking & Trust Co. (In re Nat'l Gas Distrib., LLC)*, 346 B.R. 394, 396 (Bankr. E.D.N.C. 2006).

### *(1)    Ordinary Course of Business Defense*

To determine whether a debt was incurred and paid in the ordinary course,

> [T]ypically, courts look to the length of time the parties
> were engaged in the transaction at issue, whether the
> amount or form of tender differed from past practices,
> whether the creditor engaged in any unusual collection
> activity, and the circumstances under which the payment
> was made (i.e. whether the creditor took advantage of the
> debtor's weak financial condition).

*Bison*, 473 B.R. at 177 (quoting *Compton v. Plains Marketing, LP (In re Tri-Union Dev. Corp.)*, 349 B.R. 145, 150 (Bankr. S.D. Tex. 2006)).

Baumgartner argues that the ordinary course of business defense does not apply because the transfer was made in settlement of potential litigation claims. ECF No. 18 at 14–15. It argues that payments made in settlement of litigation are *per se* not in the ordinary course of business. ICT argues that courts have found that payments made pursuant to debt restructuring agreements can be within the ordinary course of business. ECF No. 21 at 25–28.

ICT makes a strained argument. The authorities relied on by ICT involved either payments made in satisfaction of past due invoices or payments made pursuant to actual debt restructuring. First, the transfer at issue was not made pursuant to a debt restructuring agreement. And even if it was, cases determining whether a debt restructuring agreement is in the ordinary course of business have analyzed whether the restructuring is typical of past restructuring agreements between the parties. *See Lawson v. Ford Motor Co. (In re Roblin Industries, Inc.)*, 78 F.3d 30, 41–43 (2d Cir. 1996); *In re Metromedia Fiber Network, Inc.*, No. 02 B 22736 (ASH), 2005 WL 3789133, at *7 (Bankr. S.D.N.Y. Dec. 20, 2005). There is no evidence in the record of any transactions similar to the one at issue. Neither is the transaction a payment of past due invoices. *See In re Whistler Energy II, LLC*, 608 B.R. 655, 661 (Bankr. E.D. La. 2019).

As Baumgartner identifies, the transfer was a payment made pursuant to an agreement to settle and release any claims either party may have against the other. The settlement agreement, which was entered into on the eve of a bankruptcy filing, specifically provides that in exchange for the transfer,

> The Parties hereby unconditionally acquit and forever discharge the other Party of and from any and all liabilities, actions, obligations, causes of action, claims, demands, damages, costs, expenses, and compensation whatsoever, whether known or unknown, arising on or before the date of this Letter Agreement, at law or in equity or otherwise, against the other Party and any of such Party's related or affiliated persons or entities, that arise out of or are related to any goods or services provided by ICT to Lilis.

ECF No. 19-4 at 3.

The Court agrees that the transfer was not made in the ordinary course of business. The reasoning in *Barber v. Lebo (In re Indus. and Mun. Eng'g, Inc.)*, 127 B.R. 848 (Bankr. C.D. Ill. 1990), is instructive. There, the court held that a transfer in settlement of litigation was not made in the ordinary course of business. *Id.* at 850. The court first considered the legislative history of § 547(c)(2), which states:

> The purpose of this exception is to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy.

*Id.* (citing S. Rep. No. 95–989, 95th Cong., 2d Sess. 88, reprinted in 1978 U.S. Code Cong. & Ad. News 5787, 5874.). The court found that the exception "was designed to protect creditors such as employees or trade creditors, who, continuing to do business with a debtor on a regular basis do not thereby contribute to a debtor's slide into bankruptcy." *Id.*

In *Barber*, prior to the debtor filing its bankruptcy petition, the defendant had sued the debtor for wages. *Id.* at 849. After litigation commenced, the parties settled for $42,500.00, and the court entered judgment for that amount. *Id.* The debtor had made multiple payments in intervals to satisfy the settlement, and after filing bankruptcy, the trustee initiated a preference action to recover the last $5,000.00

payment. *Id.* The court found that the judgment was not incurred in the ordinary course of business because it was "incurred to settle a lawsuit." *Id.* at 850. The court held that the defendant was "not an employee or trade creditor providing materials or services, which if cut off would precipitate the debtor's slide into bankruptcy. The Defendant no longer worked for the Debtor and whether he was paid or not paid would not deny the Debtor of services needed for its operations." *Id.*

Although the parties' settlement in this case was entered into prior to any litigation being filed, the same reasoning applies. This was not a payment made in the usual course of the parties' business relationship. It is true that the parties had a business relationship, where ICT had sold manufactured equipment to Lilis. If the transfer was a simple payment of the invoices for that equipment, the result may have been different. That is not the case. The settlement agreement clearly provides that the parties had a dispute regarding the transaction and entered into an agreement to settle any potential claims arising out of the transaction. ECF No. 19-4 at 2. It makes no difference that the dispute was resolved prior to the commencement of an actual lawsuit.

The transfer was not made in the ordinary course of business.

### (2)  *Ordinary Business Terms Defense*

"The test of whether the payment arrangement conforms with ordinary business terms is 'objective'—it must be resolved by considering whether the arrangement falls within the outer boundaries of practices of the industry." *Bison*, 473 B.R. at 177 (citing *Gulf City Seafoods Inc. v. Ludwig Shrimp Co.*, 296 F.3d 363, 368–69 (5th Cir. 2002)). The analysis compares "the credit arrangements between other similarly situated debtors and creditors in the industry." *In re SGSM Acquisition Co., LLC*, 439 F.3d 233, 239 (5th Cir. 2006) (quoting *Gulf City*, 296 F.3d at 368). "[T]he creditor should provide evidence of credit arrangements of other debtors and creditors in a similar market, preferably both geographic and product." *Gulf City*, 296 F.3d at 369. "At some point the court must satisfy itself that there exists some basis in the industry practices from which the credit arrangement at issue can

be authenticated." *In re ACP Ameri-Tech Acquisition, LLC*, No. 09-
90082, 2012 WL 481582, at *9 (Bankr. E.D. Tex. Feb. 14, 2012).

ICT asserts that the transfer pursuant to the parties' settlement
satisfies the ordinary business terms defense because the type of
settlement was a standard industry practice at the time the transfer was
made. ECF No. 21 at 30. It argues that, at the time of the settlement
agreement, the parties were reacting to an unprecedented decline in
their industry as a result of the COVID-19 pandemic. ECF No. 21 at 30.
It further argues that "there is ample case law that restructuring
agreements that provide for the payment of past due invoices should not
be viewed as taking 'unusual action' when it does no more than follow
usual industry practice in response to a downturn . . . ." ECF No. 21 at
30.

The only evidence provided by ICT in support of its ordinary
business terms defense is the declaration of Mr. Bridges. The
declaration explains that "in the oil and gas industry, during industry
downturns like the oil price depression in 2020, payment for goods and
services by operators is often negotiated and agreed to on terms other
than those provided for in invoices or contract." ECF No. 21-1 at 3. This
declaration is insufficient to establish that the parties' settlement
agreement was made in accordance with industry practices during the
time. To meet its burden, ICT would have to provide evidence of
ordinary payment arrangements within the industry and in the relative
time period to demonstrate that the parties' settlement fell at least
within the "outer boundaries" of ordinary practices. *See Bison*, 473 B.R.
at 177. ICT has failed to provide any evidence of industry practices.
ICT's inference that the ordinary means of resolving disputes would
transmogrify the payment into industry terms is inconsistent with the
plain meaning of the statute.

ICT has failed to meet its burden of providing evidence to create
a genuine issue of material fact as to whether the transfer fell within
ordinary business terms. The defense is inapplicable.

## IV.   SUMMARY JUDGMENT ON BAUMGARTNER'S 11 U.S.C. § 550 CLAIM IS DENIED

Baumgartner moves for summary judgment on its claim for recovery of avoided transfer under 11 U.S.C. § 550.  ECF No. 18 at 18–19.  Section 550(a) allows the trustee to recover property transferred or the value of property transferred to the extent that a transfer is avoided under § 547.

Because summary judgment is denied on Baumgartner's avoidance cause of action, Baumgartner is not entitled to recover any transfer at this stage of the proceeding.

## CONCLUSION

The Court will enter an order consistent with this Memorandum Opinion.

SIGNED 07/19/2024

_____
Marvin Isgur
United States Bankruptcy Judge